UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ANGELA MANNING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:21-cv-00360-HAB |
| | ) |
| IOM HEALTH SYSTEM, L.P., | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff, Angela Manning ("Manning"), believes that she was qualified and deserving of a promotion from Defendant, IOM Health System, L.P. ("IOM"). After going through the application process, IOM rejected Manning for the position and internally promoted a white woman instead. Manning, a black woman, now claims that IOM did not promote her because of her race.

Presently before the Court is IOM's Motion for Summary Judgment. (ECF No. 41). The motion has been fully briefed (ECF Nos. 42, 49, 52) and is ripe for ruling. For the reasons below, IOM's Motion for Summary Judgment will be GRANTED.

**I. Factual Background**

In April 2019, IOM hired Manning as the Environmental Services Department ("EVS") supervisor at its hospital. (ECF No. 48, ¶¶ 23-27). She worked in that role until IOM outsourced its EVS services to a third party in the spring of 2020. (*Id.* ¶ 28). Manning thus turned to IOM's online job board. She applied for over 10 positions from January 15 to March 23, 2020. (*Id.* ¶¶ 31-40, 55-56). Pertinent here, Manning applied for the "Network Manager, Supply Chain—Analytics" within IOM's Materials Management Department on March 3, 2020. (*Id.* ¶¶ 55-56).

IOM, like most employers, maintained procedures for the hiring or promoting of employees. IOM's process started with it posting open positions on its online job board. (*Id.* ¶ 10). After a person applied for an open position, the department manager evaluated the candidate's application and interview scores. (*Id.* ¶¶ 11-12). Depending on the nature of the position, experience may have stronger weight than degrees. (*Id.* ¶¶ 7-9). If satisfied with the candidate, the manager would then send a request to IOM Human Resources to prepare a recommendation for an offer to the candidate. (*Id.* ¶ 13).

Human Resources personnel then conducts its own review of the candidate. (*Id.* ¶ 14). With the aim of getting the most qualified candidate, Human Resources personnel could ask the department manager for clarification or raise questions about a candidate's qualifications. (*Id.* ¶¶ 14-16). If satisfied with the candidate, Human Resources personnel would determine a pay range and send a salary recommendation to the department manager. (*Id.* ¶ 17). Although the department manager had final say on whether to provide an offer, no offers could be made without going through the Human Resources review and the salary determination process. (*Id.* ¶¶ 18, 20).

Steve Hennick ("Hennick") was the director of IOM's Materials Management Department in 2020. (*Id.* ¶ 43). He oversaw the entire department and had authority to hire, fire, and discipline personnel. (*Id.* ¶¶ 43, 48). Hennick thus was responsible for hiring or promoting an employee to Network Manager when Manning applied.

Before EVS was outsourced, Manning sat for three interviews for the Network Manager position. (*Id.* ¶ 59). She first interviewed with Hennick followed by peer interviews with Margaret McClurg and Melissa Scarberry ("Scarberry"), other employees in the Materials Management Department. (ECF No. 49-3, 55:14-22). After these interviews, Hennick sent Patricia Jones ("Jones"), IOM Human Resources personnel, Manning's application, history, and interview scores

2

as part of his request for consideration to offer Manning the Network Manager position. (ECF No. 48, ¶ 60).

A moment on Scarberry. In March 2020, she applied for the Network Manager position at Hennick's request. (*Id.* ¶ 63; ECF No. 43-20). Scarberry, a white woman, was the employee that Hennick wanted to promote to Network Manager when the position opened. (*Id.* ¶ 80). As the most senior Analyst in IOM's Materials Management Department, she seemed liked a shoo-in. (*Id.* ¶ 64). The Network Manager, after all, "manages the supply chain analytics team" and serves "as a technical and operational expert" on such topics for IOM. (ECF No. 43-17). Her knowledge relating to material management and supply chain practices fit the bill. Even still, Scarberry withdrew her application after interviewing on her own accord. (ECF No. 48, ¶ 66). Without Scarberry in the running, Hennick pursued Manning for Network Manager.

Jones then conducted Manning's Human Resources review. During the review, questions arose regarding Manning's background work experience. (*Id.* ¶ 68). The Network Manager needed substantial knowledge of hospital supply chain practices. (*Id.* ¶ 70). Although Manning met the educational requirements, there were concerns over her experience related to material management and the processes of Supply Chain Analysts. (*Id.* ¶ 73). Hennick never received a salary determination after Manning's Human Resources review. (*Id.* ¶ 91). The Network Manager position remained open.

As EVS services were outsourced, Manning began working in the Materials Management Department under Hennick. (*Id.* ¶ 49). Manning argues that she was offered the Network Manager position and held that title when she started her employ in the Materials Management Department on April 13, 2020. (ECF No. 49-5). Yet there is no indication that Hennick officially offered Manning the position or that IOM Human Resources approved Hennick's request for

3

consideration. And Manning ironically admits that "officially she did not get the [Network Manager] position" (ECF No. 45-1). Meanwhile, Scarberry re-applied for the Network Manager position in April 2020. (ECF No. 48, ¶ 66).

With concerns over Manning's experience specific to the Materials Management Department, Hennick informed Manning that he planned to interview Scarberry and put her through the process. (*Id.* ¶ 77). As with Manning, he sent Scarberry's interview scores, history, and application to Jones with a request for consideration to offer. (*Id.* ¶ 84). Scarberry's interview scores were higher than Manning's scores and she had been a Supply Chain Analyst for about four years. (*Id.* ¶ 83, 85). Jones gave Hennick a salary determination and approved his consideration to offer Scarberry the Network Manager position. (*Id.* ¶¶ 86, 89). On May 18, 2020, Scarberry accepted the position. (*Id.* ¶ 89).

Scarberry's prior position as a Supply Chain Analyst opened up when she became Network Manager. (*Id.* ¶ 94). Hennick encouraged Manning to apply for the vacancy and, on July 9, 2020, she applied for the Analyst position. (*Id.* ¶¶ 94, 96, 97). Her application, resume, and cover letter never mentioned having any experience as a Network Manager. (*Id.* ¶¶ 97-99). Nor did Manning mention being a Network Manager in her interviews for the Analyst position. (ECF No. 49-5, ¶ 5). After going through the Humans Resources review, Manning received an offer for Analyst position which included a pay increase. (ECF No. 48, ¶¶ 100, 133).

When Manning started with IOM as EVS supervisor, her pay rate was $19.06 per hour. (*Id.* ¶ 27). When she started in the Materials Management Department on April 13, 2020, she maintained the same pay rate. (*Id.* ¶ 51). Jones calculated and determined the recommendations for a pay range for newly hired or promoted employees. (*Id.* ¶ 125). There was an established salary range for each position along with guidelines for placing an individual in a particular pay

4

range. (*Id.* ¶ 129). No credit was given for education or certifications when determining the pay ranges. (*Id.* ¶ 130). Using this process, Jones determined Manning's Analyst pay rate to be $21.97—the bottom of the applicable pay range.[1] (*Id.* ¶¶ 119, 132).

On June 16, 2020, Manning filed a Charge of Discrimination with the City of Fort Wayne Metro Human Resourced Commission ("Fort Wayne Commission") and the EEOC, alleging that IOM engaged in racial discrimination by hiring Scarberry for Network Manager over Manning. (ECF No. 43-7). She amended her Charge about a month later adding that she believed she was retaliated against for filing an EEOC complaint against Shared Services Center—part of IOM's network—four years earlier. (ECF No. 43-8). Manning again amended her Charge on August 5, 2020, to include a claim that IOM discriminated against her because her Analyst pay rate did not adequately compensate for her education and experience. (ECF No. 43-9).

In a four-count Amended Complaint, Manning now sues IOM in this forum. (ECF No. 7). Counts 1 and 2 assert claims of retaliation under 42 U.S.C. § 1981 ("Section 1981") and 42 U.S.C. § 2000 *et al.* ("Title VII"). Counts 3 and 4 are claims of racial discrimination under the same provisions. In short, Manning believes she was retaliated against for filing her 2020 Charge and 2016 EEOC Complaint. And she contends that IOM engaged in racial discrimination by giving the Network Manager position to Scarberry.

IOM claims otherwise and moves for summary judgment on all claims. (ECF No. 41). As for Manning's retaliation claims, it contends that the 2020 Charges and 2016 EEOC Complaint have nothing to do with its decision promote Scarberry to Network Manager. As for the discrimination claims, IOM considers the record devoid of any evidence that it engaged in racial

---

[1] Using the same process, Scarberry was also given a salary at the bottom of the applicable pay range when she was offered the Network Manager position. (ECF No. 48, ¶ 132).

discrimination. Manning responded solely to IOM's arguments regarding the discrimination claims and believes that she has garnered enough evidence to preclude summary judgment.

## II. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n order to withstand summary judgment, the nonmovant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations." *Gabrielle M. v. Park Forest-Chicago Heights., Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003). Still, a court must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650 (2014).

The Court's role is not to weigh the evidence or evaluate the credibility of the witnesses. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). But the "non-movant does not satisfy its burden merely by pointing to self-serving allegations that otherwise are without evidentiary support." *Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994). Indeed, "summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005), *cert. denied*, 546 U.S. 1033 (2005) (quotations omitted).

## III. Discussion

Manning asserts two counts of retaliation and two counts of discrimination, all falling under Title VII and Section 1981. While Manning brings four counts in her complaint, "the substantive standards and methods that apply to Title VII also apply to [Section 1981]." *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir.

2013). Therefore, the analysis governing a Title VII claim and a Section 1981 claim are the same, and the cases discussing claims under either provision are instructive. *See id.* This is true whether the claim is made under theories of retaliation or discrimination. *See Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (retaliation); *Paul v. Theda Med. Ctr., Inc.,* 465 F.3d 790, 794 (7th Cir. 2006) (discrimination).

Mindful of this, the Court need only perform two analyses—one for Manning's retaliation claims and one for her discrimination claims.

### A. Retaliation Claims

Title VII prohibits employers from retaliating against an employee that "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). To defeat summary judgment, Manning must present evidence that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *See Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022).

To be sure, filing of a Charge with the Fort Wayne Commission and the EEOC is a statutorily protected activity. So too, "[f]ailure to promote can be an adverse action giving rise to liability." *Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010). IOM thus does not challenge the first two elements of Manning's retaliation claim; rather, it posits that there is no causal link between Manning's Charges and giving Scarberry the Network Manager position. Nor are her Charges related to IOM's determination of Manning's Analyst pay rate.

Manning's response brief did not address this argument. (ECF No. 49). And likely for good reason. The record is absent of any evidence that Manning's Charges were considered during IOM's application process for Network Manager or when Human Resources determined her

7

Analyst pay rate. Indeed, there is no evidence that Hennick and Jones were even aware of Manning's 2016 complaint with the EEOC when IOM promoted Scarberry to Network Manager. (ECF No. 48, ¶¶ 74, 76, 106). And Manning's June 2020 Charge was not filed until after Hennick gave Scarberry the Network Manager position.[2] Simply, there is no evidence that the protected activities here caused IOM's decision to hire Scarberry.

Similarly, there is no evidence that Jones considered Manning's Charges when determining her Analyst pay rate.[3] Jones followed IOM's standard procedure when determining Manning's new pay rate. (*Id.* ¶ 131, 134). Manning also admits that IOM Human Resources "did not ever consider a complaint with [IOM] or to the EEOC or a court lawsuit when determining compensation rates." (*Id.* ¶ 104). There is no causal link between Manning's protected activities and her Analyst pay rate either. Without any evidence for a jury to conclude otherwise, the Court grants summary judgment for IOM on Counts 1 and 2 of Plaintiff's Complaint.

### B. Discrimination Claims

Title VII also makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). For discrimination claims, a plaintiff can meet their burden on summary judgment using the direct or the burden-shifting methodologies. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas*

---

[2] Manning admits in her response to IOM's Statement of Material Facts that "failing to promote [Manning] for the [Network] Manager position could no be related to her 2020 filing[.]" (ECF No. 48, ¶ 117).
[3] Hennick was not involved in determining Manning's Analyst pay rate. (ECF No. 48, ¶¶ 17, 125).

*Corp. v. Green*, 411 U.S. 792 (1973), a court should assess the case in those terms. *Id.*; *see also Ferrill v. Oak-Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (noting that *McDonnell Douglas* burden-shifting analysis has not been displaced). Still, no matter which path a plaintiff chooses, the Court must consider all the evidence together to determine whether a reasonable jury could "conclude that the plaintiff's...[race] caused the [adverse action]." *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d. 760, 765 (7th Cir. 2016).

Without any direct evidence of discrimination here, Manning chooses to make her prima facie showing under the burden-shifting framework. Under this approach, Manning must come forward with evidence that (1) she is a member of a protected class, (2) she applied for and was qualified for the Network Manager position, (3) she was rejected for that position, and (4) IOM granted the promotion to someone outside the protected class who was not better qualified than Manning, or the Network Manager position remained open. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). If she establishes this prima facie showing, the burden shifts "to [IOM] to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (citation omitted).

Manning is an African American, a protected class, and she was rejected for the Network Manager position. Hennick also admitted that the Network Manager position remained open after Manning was rejected and before Scarberry, a white woman, was promoted. IOM thus challenges the second element and contends that Manning simply was not qualified for the job.

According to IOM's hiring process, Hennick initially evaluated Manning's application and interview scores. Hennick then sent Human Resources a request to prepare a recommendation for offer to Manning. Human Resources then raised some questions about Manning's qualifications.

The Network Manager position came with significant responsibilities as shown by the following job description:

> Under the supervision of the supply chain director/network, manages the supply chain analytics team and assures associate compliance with all hospital and material management policies and procedures, as well as department compliance of education and associate performance appraisals. Provides guidance to the purchasing teams, serving as a technical and operational expert, and resource to the network with focused responsibilities in the areas of group purchasing organization (GPO) agreements, locally negotiated agreements, service, maintenance, lease and rental agreements, as well as major capital purchases. Responsibilities include financial and operational analysis of existing purchasing practices, decision support, and contract execution. Responsible for overseeing various aspects of the MMIS system including item catalog, item inventories, asset locations master activity and hospital supply expense committees. Manages special projects and other assignments, as required.

(ECF No. 43-17). Without laboring through every aspect of the position, there were concerns with Manning's experience specific to material management for the health system. She had only worked in the Materials Management Department for a short time, if at all, when her application was processed. As Network Manager, she would also be responsible for managing the Supply Chain Analysts. Having never been an Analyst herself, there were concerns that she lacked the understanding to lead such a group. Because Manning lacked experience specific to the position, IOM elected to give the position to Scarberry.

That said, IOM admits that Manning met the "minimum qualifications" for Network Manager:

> Experience: 3-4 years progressively more responsible experience in inventory management, which includes purchasing procedures and 2-3 years in a management role. Prior experience in the areas of healthcare purchasing and contract management, financial analysis and decision support.

> Education: requires a minimum of a bachelors of science degree in business, accounting, finance, or a related field. Additional experience in lieu of education may be considered.
>
> Education required: bachelors or better in business administration or related field.
>
> Experience required: 3-4 years progressively more responsible experience in inventory management, which includes purchasing procedures and 2-3 years in a management role.

(*Id.*). Manning's education fit the bill as she had degrees in Organizational Leadership and Supervision, Human Resource Management, Business Administration, and Healthcare Management. (ECF No. 49-8). And although IOM maintains that she lacked experience specific to the Network Manager position, Hennick believed she was qualified. (ECF No. 49-4, 44:15-17). Viewing the facts in the light most favorably to Manning, there is at least a question of fact precluding summary judgment on her prima facie showing.

The burden thus thrusts back to IOM "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Simpson*, 827 F.3d at 661. And its argument does not change much. IOM continues to press that Manning lacked knowledge specific to material management and supply chain analytics. Meanwhile, Scarberry was the most senior Analyst in the Materials Management Department at the time the Network Manager position opened. Not only that, but she had worked her way up from the bottom of the Materials Management Department's totem pole. She started as a clerk, a bottom level position, in 2014. In 2015, she was promoted and became a buyer for the department. In 2016, Scarberry became an Analyst where she worked until she received the Network Manager position. IOM claims it gave Scarberry the position because she had actual, hands-on knowledge and experience in the Materials Management Department—precisely what Manning was lacking. *See Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) (hiring someone who the employer believes is better qualified for a position is a legitimate,

nondiscriminatory reason for action). IOM has thus, met its burden and the analysis shifts back to Manning.

Manning can save her claim by proving that IOM's proffered reason is pretextual. *Id.* Pretext is a "lie, specifically a phony reason for some action." *Russell v. Acme-Evans, Co.*, 51 F.3d 64, 68 (7th Cir. 1995). Absent direct evidence, a "plaintiff must prove pretext indirectly by showing one of the following: (1) Defendant's explanation of Plaintiff's [rejection] had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) at least the reason stated was insufficient to warrant the [allegedly discriminatory action]." *Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 732 (7th Cir. 2001). "One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Appelbaum v. Milwaukee Metro. Sewage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003).

Manning believes that IOM proffered inconsistent reasons for not hiring her as Network Manager. And she points to several inconsistencies which she believes precludes summary judgment for IOM:

> First, Defendant has given shifting and inconsistent reasons for failing to promote Ms. Manning. First, Ms. Manning was offered the position and began working as the Network Manager – Supply Chain in April 2020. Second, Hennick informed Ms. Manning that Jones made the decision not to hire Ms. Manning because she did not have healthcare analyst experience. However, Jones testified that she never told Hennick that Ms. Manning could not be hired due to her lack of experience, she testified that she was only asking Hennick for clarification and additional information and confirmed that hiring individuals was at the sole discretion of the hiring manager, Hennick. Third, Hennick testified that after Ms. Manning was informed that she would not receive the position, the position remained open, not that a better qualified individual was hired and/or offered the position. Fourth, Defendant stated that Ms. Manning was not qualified for the position because she did not have healthcare analyst experience, but Hennick testified that Ms. Manning was qualified for the position.

(ECF No. 49 at 4). As Manning acknowledges in her brief, IOM did not promote her "because she did not have healthcare analyst experience." (*Id.*). She also admits that "she did not have experience in Supply Chain healthcare purchasing or history as an actual Analyst in any materials or supply chain." (ECF No. 48, ¶ 58).

Some Seventh Circuit pretext precedent has been phrased in a way that requires a plaintiff to show the employer's non-discriminatory reason was dishonest, *and also* to show that the employer's true reason was discriminatory. *See e.g.*, *Logan v. City of Chicago*, 4 F.4th 529 (7th Cir. 2021) ("[I]n order to show pretext, Logan must 'show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent.'"), quoting *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010); *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009) ("Our recent Title VII cases explain that a plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent."). But recently the Court, in a footnote, made clear that "[t]his language should not be interpreted to suggest that a plaintiff must show both pretext *and* some additional evidence of discrimination to permit the inference of unlawful intent." *Runkel v. City of Springfield*, 51 F.4th 736, 745 n.3 (7th Cir. 2022). The *Runkel* Court expressed concerns that such a requirement would conflict with *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

But *Hicks* acknowledged that "pretext" means "pretext for discrimination." *Id.* at 515-16. And *Runkel* held as follows: "*In addition to some direct evidence of race being a factor*, the inconsistencies in the evidence permit the inference that the City's non-discriminatory explanations for promoting Wilkin are dishonest, in turn allowing a reasonable jury to infer the City's true purpose was intentional racial discrimination." *Runkel*, 51 F.4th at 746 (emphasis

added). Even *Runkel* appears to require *some* evidence of race being a factor. The ultimate question remains the same: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Board of Trustees of Cmty. Coll. District No.* 508, 846 F.3d 216, 224 (7th Cir. 2017). While there may be some evidence of "pretext," there is no evidence of "pretext *for discrimination*" here. *See Hicks,* 509 U.S. at 515-16 (emphasis added).

Manning's proffered inconsistencies do not support an inference of intentional discrimination. Scarberry, the person Hennick wanted to internally promote, initially applied for Network Manager but withdrew her first application. Without Scarberry, Hennick turned toward Manning and, after her interviews, he sent a hiring recommendation to IOM Human Resources. During Human Resources' review, questions arose about Manning's experience in which Jones asked Hennick for clarification. Hennick may have believed Manning was qualified. And Hennick may have told Manning that Human Resources would not allow him to promote her despite him having ultimate hiring authority. But after Jones inquired into Manning's qualifications, both Jones and Hennick agree the decision not to promote Manning was made due to her lack of experience as an Analyst in the Materials Management Department.

Whether the position remained open versus whether IOM hired a more qualified individual also does not convince this Court. The position remained opened until IOM hired Scarberry, whom it believed to be a better qualified candidate based on her experience. And just because Manning met the minimum qualifications does not mean that IOM must promote her. To that end, Manning appears to imply that she was more qualified for the position than Scarberry who lacked a college degree.

"[W]e have set a high evidentiary bar for pretext." *Riley v. Elkhart Cmty. Sch.,* 829 F.3d 886, 894 (7th Cir. 2016). Evidence of Manning's qualifications "only would serve as evidence of

14

pretext if the differences between her and [Scarberry] were 'so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was *clearly better qualified* for the position at issue.'" *Id. (*quoting *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009)) (emphasis in original).

Manning seems to place much emphasis on her having several degrees while Scarberry has none. But her "subjective belief that she was better qualified than [Scarberry] does not, without more, demonstrate pretext." *Johnson,* 260 F.3d at 733. And the Network Manager job posting explicitly stated, "[a]dditional experience in lieu of education may be considered." (ECF No. 43-17). Any gaps in the education section of Scarberry's resume were bridged by her hands-on experience in the Materials Management Department.

Simply put, Manning is not "clearly better qualified" than Scarberry. Manning has the educational degrees. Nobody questions her drive. But over the course of about six years, Scarberry worked in three positions within the department, including four years as an Analyst. As Manning admits, Network Manager is a "big position" in the IOM's network. Based on the nature of the position, it seems reasonable to hire somebody with the experience specific to IOM's Materials Management Department. This is all the more true considering the Network Manager would be overseeing a team of Analysts, a position Scarberry was intimately familiar with.

The Court is not a "super personnel department that second-guesses employers' business judgments." *Riley,* 829 F.3d at 894. While Manning presses that "Scarberry was hired because she was white" (ECF No. 48, ¶ 87), the record is shockingly bare of any evidence to that effect. Without the evidentiary backing, that assertion amounts to nothing more than "mere speculation" which

the Seventh Circuit has consistently "held is insufficient to avoid summary judgment." *See Hanners v. Trent*, 674 F.3d 683, 690 (7th Cir. 2012). Such is the case here.[4]

### IV. Conclusion

For these reasons, Defendant's Motion for Summary Judgment (ECF No. 41) is GRANTED. The CLERK is DIRECTED to enter judgment for Defendant and against Plaintiff on all claims asserted in Plaintiff's Complaint (ECF No. 1).

SO ORDERED on July 10, 2024.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

---

[4] Manning did not respond to IOM's argument that her race had no effect on her salary determination as an Analyst. (ECF No. 42). For the sake of completeness, there is also no evidentiary support for the notion that Manning's race affected her pay as an Analyst. Jones followed IOM's standard procedures in determining Manning's Analyst pay rate. And Manning admits that her "race was never considered in evaluating her pay rate for the Analyst position." (ECF No. 48, ¶ 110).